## AFFIDAVIT OF DETECTIVE BRIAN BALL

I, Detective Brian Ball depose and state as follows:

## I

## INTRODUCTION

1.      I am presently a Boston Police Detective, currently assigned to the Boston Police Youth Violence Strike Force (Gang Unit).   I have been a Boston Police Officer since 2003 and was promoted to Detective in June of 2015.   I am also federally deputized as a Task Force Officer assigned to the U.S. Marshals Massachusetts Task Force.   My duties as a Detective and Task Force Officer assigned to the Youth Violence Strike Force include evidence collection and analysis and the coordination of investigations both within the Youth Violence Strike Force and with outside agencies.   I am also responsible for preparing search warrants and assisting with the execution of those warrants.   I have participated in numerous state and federal investigations that have resulted in the seizure of firearms and drugs.   These investigations have required the use of confidential informants/cooperating witnesses, electronic monitoring equipment, surveillance and search warrants.    During the course of these investigations, I have testified in both state and federal court on numerous occasions.

2.      I am currently part of an investigative team consisting of the BPD, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Federal Bureau of Investigation ("FBI"), the Massachusetts State Police ("MSP"), the Suffolk County Sheriff's Office and several local Massachusetts Police Departments.   This team is involved in the investigation of the criminal activities of a criminal organization identified as "NOB," as well as related criminal activities involving a criminal organization known as the Wendover gang ("Wendover").

3.      We are currently investigating Jahquel Christmas, and others, for various federal crimes, including RICO conspiracy in violation of 18 U.S.C. § 1962(d) (the "Target Offense").

4.      This affidavit is being submitted in support of an application for a warrant to search the premises at 263 East Cottage Street, Apartment 2, Dorchester, MA (hereinafter the "Target Location").   Jahquel Christmas resides at this address with his family and has consistently given this address on recent public records.   In January of 2020, Christmas listed the Target Location as his address while filing an insurance claim.   Christmas's mother also lists the Target Location as her address on public records and Massachusetts Registry of Motor Vehicles documents.   On May 28, 2020, Jahquel was observed by investigators entering and exiting 263 East Cottage Street, and entering his mother's parked vehicle outside the Target Location.

5.      The information contained in this affidavit is based on oral and written reports by other law enforcement officers, physical surveillance, information from witnesses, public records, database checks, and other investigations.   The dates and times in this affidavit are approximate. Because this affidavit is submitted for the limited purpose of supporting issuance of a search warrant for the Target Location, I have not presented every fact learned during the investigation, but only that information necessary to fully support probable cause for a warrant.

## II

## PROBABLE CAUSE FOR ISSUANCE OF SEARCH WARRANT

6.      This affidavit is based on an ongoing, multi-agency investigation into the criminal activities of NOB and its members/associates.   Local and federal investigators (including BPD, ATF and FBI) have been involved in a federal investigation of NOB, and the Wendover street

gang, since the summer of 2019.   Both gangs originated in the Dorchester section of Boston.

NOB is associated with the older Wendover gang.   The investigation has established that

members and associates of NOB are involved in various crimes, including, but not limited to,

murders, attempted murders, armed robberies, drug trafficking, sex trafficking, and illegal

firearms crimes.   The crimes committed by NOB members and/or associates have taken place in

various communities in Massachusetts including, but not limited to, Boston, Randolph, New

Bedford, Stoughton, Brockton, East Bridgewater, Taunton, and various communities on Cape

Cod.   Members and/or associates of NOB have also been involved in criminal activity in other

states, including, but not limited to, Rhode Island, Maine, and Connecticut.   Per the ongoing

investigation, Christmas is a member/associate of NOB. Along these lines, investigators have

identified multiple recorded jail calls in which Christmas has spoken to incarcerated

members/associates of NOB regarding gang-related topics.   For example, on March 1, 2020,

Christmas spoke with incarcerated NOB member Malik Hobson, and it is the belief of officers

that, through coded language, informed Hobson that he would assist Hobson in acquiring a

firearm upon his impending release.

      7.     NOB members/associates have committed several violent crimes over the last

approximately three years, including multiple murders and shootings.   Many of these violent

crimes have targeted rival street gang members, particularly members/associates of the Cameron

Street gang.   NOB members/associates have also been involved in physical assaults against rival

gang members, both on the street and while being held in state custody.

      8.     NOB members/associates, including Christmas, openly refer to themselves as

being part of "NOB."   NOB members/associates also use certain numbers to denote their

membership/association with the gang.   For example, members/associates use the numbers "3" and "4" together to reference the gang as well as the number "7981."   These gang-related numbers are openly used by Christmas and other gang members/associates including in: (1) gang-related hand signs; (2) gang-related tattoos; (3) gang-related clothing; and (4) gang-related videos.   NOB members/associates also refer to themselves as being part of the "Head Shot Mafia" and use the acronyms "HSM" or "H$M."   In rap videos, NOB members brag that they are in the "Head Shot Mafia gang."   The acronyms "HSM" or "H$M" are used by gang members/associates to identify themselves in tattoos as well as in clothing. Members/associates, including Christmas, use hand signs to identify themselves as being part of NOB.   These hand signs include the use of "3" and "4."   Members/associates also use an inverted "H" hand sign (which can be done with one hand or two hands).   Investigators have observed numerous social media postings in which Christmas regularly displays gang hand signs.   As recently as May 25, 2020, Christmas posted a photograph on social media of him with his arm around another NOB member/associate, who is making the 3 and 4 gang hand sign.

9.     Members/associates of NOB have also produced rap recordings and videos which are gang-related.   Jahquel Christmas has appeared alongside NOB member Michael Brandao, one of the two primary NOB members responsible for these recordings and videos.   In these videos, Brandao has repeatedly stated that: (1) he is an active and leading member of NOB; (2) he has committed multiple shootings and murders on behalf of the organization; and (3) he and the gang will continue to commit gang-related violence. In these videos, Christmas and other NOB members have openly flashed gang hand signs and/or worn gang-related clothing. Christmas has appeared in the majority of NOB-related rap videos.   His most recent appearance

was in March of 2020 in the NOB-related rap video titled "This is My City."   In this video he and several NOB members appear together with the "HSM" logo displayed on a monitor in the background. Other NOB associates in the video are making gang-related hang signs, and NOB member Joseph Gomes displays a gang-related tattoo.

10.     During the course of this investigation, a search warrant was executed on the digital contents of a phone recovered from NOB member Darius Bass.   Investigators recovered electronic messages from late 2016.   The recovered electronic messages involved Bass and other NOB members/associates, including Christmas, discussing various topics including the acquisition of firearms for the group as well as the violent conflict with the Cameron Street gang. Many of these text messages were on group chats between multiple NOB members/associates. In group chats, there were discussions relative to the group acquiring firearms.   For example, in one text chain, a NOB member/associate asked if Darius Bass could reach out to an associate to acquire a firearm for the group to share.   Christmas agreed with the proposal, and urged the group to contribute money towards this effort.   Christmas was involved in numerous communications involving obtaining firearms for the group.

11.     Other text messages recovered from Bass' phone indicate that Christmas is an active member of NOB, intent on committing acts of violence against rival gangs, including the Cameron Street gang and the Homes Avenue gang.   Christmas frequently communicated about "social media banging" between Darius Bass and "Wade" – a name used for a Cameron Street gang member/associate.   "Social media banging" is common amongst rival gang members/associates, and routinely involves disparaging other gang members individually and/or as a group.   After learning that "Wade" was upset that Bass threatened to urinate on a deceased

Cameron Street gang associate's memorial, Christmas discussed desecrating the memorial.   As another example, Christmas was involved in communications involving NOB gang members/associates traveling to the University of Massachusetts Dartmouth in October 2016 for a party.   In these communications, it was discussed that the NOB members/associates could encounter Cameron Street gang members/associates at the party.   A shooting did occur on the campus of the University of Massachusetts Dartmouth the night of the party, and a firearm used in that shooting was subsequently recovered in a vehicle used by Darius Bass.

12.     On March 1, 2020, Christmas received a recorded jail call from incarcerated NOB member Malik Hobson.   Hobson informed Christmas that he would be released from jail in two weeks.   Christmas responded: "Yeah man, soon come, soon come … we gonna link up, we gonna get right," and informed Hobson that they (he and Hobson) need to get Hobson a "bitch." Hobson informed Christmas that he already has three "bitches."   Christmas corrected Hobson that Christmas was talking about a "real bitch" that Hobson could keep in his house while on home confinement.   Though the language used is coded, as they are aware the call is being recorded, it is the belief of investigators that Christmas is informing Hobson that he will help him acquire a firearm upon his impending release from jail.   As set forth above, investigators have recovered past electronic communications involving Christmas and other NOB members/associates in which they discussed obtaining firearms for use by the gang members/associates.

13.     On March 5, 2020, Christmas was involved in a jail call with Ricky Pina, an incarcerated member of NOB, and several other NOB members/associates.   Pursuant to our ongoing investigation, Ricky Pina is a leader in the NOB drug distribution network as well as

being involved in violent crimes.   Also included on the call were other NOB
members/associates who have been identified as committing various crimes per the investigation
including Joshua Teixeira (who was involved in drug trafficking and violent crimes), Joseph
Gomes (who was involved in two gang-related armed robberies), Malik Hobson (who was
involved in a gang-related armed robbery in 2017 with Joseph Gomes), Darius Bass (who was
involved in a 2017 attempted murder) and Patrick Pina (who is involved in the NOB drug
distribution network).   During this call, Pina asked Teixeira about a member/associate of a
different street gang who should have been assaulted in custody.   Teixeira responded that he
was unaware that the individual was to be targeted, and noted later that the individual had aided
Teixeira in assaulting a different gang member when Teixeira was in custody.   Pina informed
Teixeira that the target gang member, who was still incarcerated, had previously denigrated NOB
through social media postings.   Pina and Teixeira then identified that NOB member Brian
Cardoso was incarcerated with the target gang member.   It was agreed that Cardoso would be
contacted to assault the target.

14.     On March 22, 2020, Brockton Police officers responded to a call for shots fired at
the Super 8 Motel on Westgate Drive in Brockton.   Shell casings and spent cartridges were
recovered by Brockton Police.   Based on the investigation by Brockton Police officers,
individuals were asked to leave a party taking place in one of the motel rooms.   One of the
individuals asked to leave thereafter fired at least five shots through the window of the motel
room from outside the motel room while the party was taking place in the motel room.   Several
witnesses were interviewed and gave accounts of a group of individuals arguing, followed by
gunfire.   One witness identified the shooter as "JQ," and stated that she knew him from having

attended high school together.   Jahquel Christmas is referred to by NOB members, both in jail

calls and in text messages, as "JQ."   Another witness described the shooter as having dread-style

hair and pointed to a male in a motel video as the shooter.   He was further described as being a

"light skinned black male…with dreads."   Additionally, he was described by the responding

officer as being "chubby," significant due to the fact that Christmas' frame can be described as

"heavy."   Investigators later obtained an image from security video footage, and determined that

the male identified as the shooter was Jahquel Christmas.   Investigators identified that, on the

night of the shooting, Christmas was also in the company of NOB member/associate Patrick

Pina.   Per a witness, Christmas was told to leave a party in one of the rooms of the motel.

Christmas responded that he was going to return, and further stated: "You'll see what happens."

Based on the ongoing investigation, NOB members/associates are expected to respond in violent

fashion when confronted.   A failure to respond aggressively to confrontation is seen as

weakness and is antithetical to the gang's operations.   As a result, members who fail to respond

violently to confrontation are ostracized by the gang, and, in some cases, are actually targeted by

the gang.   Thus, Christmas' involvement in this shooting is consistent with the violence

expected by the gang from one of its members/associates.

     15.     On May 2, 2020, Christmas was involved in gang-related violence.   On that date,

BPD officers responded to a call for shots fired at 152 East Cottage Street, Dorchester, MA, the

home of NOB member Joshua Teixeira.   On arrival, they located two groupings of shell casings,

indicative of two parties shooting at each other.   BPD detectives were able to recover video of

the shooting.   This video shows that prior to the shooting, NOB members/associates Christmas,

Teixeira, Delven Carvalho-Centeio, Darius Bass, Michael Brandao and Patrick Pina were

congregating in the driveway of 152 East Cottage Street.   Video shows an unknown male approach the group in the driveway and fire several gun shots in their direction.   It was determined through the investigation that Brandao used a handgun to fire several shots towards the male.   No persons were hit in the exchange of gunfire.   The male fled the driveway and was last observed running down East Cottage Street, away from the scene.   Detectives were able to view additional video that shows Brandao handing his firearm to Carvalho-Centeio, who then runs from the scene and conceals the firearm in a nearby alley.   Detectives were able to recover the 9mm firearm from the alley and observed that the shell casings in the driveway were 9mm caliber shell casings. These casings and firearm were tested and it was determined that the casings were ballistically linked to the recovered firearm.   Brandao and Teixeira remained on scene and the other NOB members, including Christmas, fled prior to BPD arrival.

16.     In a recent call, placed on June 1, 2020, NOB member Michael Brandao, currently incarcerated at Nashua Street Jail, directed Christmas to collect money from an individual associated with NOB.   This individual is believed to be a manger of the HSM recording label and involved with the creation of NOB-related videos.[1]   In a separate jail call between this individual and Brandao, the individual made statements consistent with his understanding that the HSM recording label was a means of laundering money for NOB members/associates.   In the June 1 call, Brandao instructed Christmas to "get with" NOB member Tyrone Meek (a close associate of Brandao), and approach this individual to collect

---

[1]  In an October 2019 recorded jail call, an incarcerated NOB associate (who was involved in drug trafficking with several of other individuals including NOB members Kelvin Barros and Samael Mathieu) told an associate who needed marijuana that he should contact this individual or NOB member Delven Carvalho-Centeio because they were distributing marijuana under the name "HSM" – the same name as the recording label.

money.   Christmas was instructed to use violence if necessary.   Christmas agreed to carry out Brandao's directive.

### III

### BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT

17.    Based on my training and experience, I know that individuals typically possess in their residences documents and other items that reflect their occupancy and control of the premises, such as personal mail, checkbooks, identification, notes, correspondence, leases, utility bills, rent receipts, financial documents, keys, and photographs.

18.    Based on my training and experience, I am aware that members and associates of violent street gangs, such as NOB, maintain various types of gang-related materials at their residence as part of their membership in or association with the gang, including:

a.    Gang-related photos or images, such as group photos of gang members, photos of other gang members/associates, photos of gang-related graffiti, photos of gang-related hand signs, photos of guns or drugs possessed by the gang, photos of stacks of money, and photos of gang-related symbols;

b.    Gang-related documents, such as gang-related notes, gang-related letters (including letters ordering gang activities or discussing the operation of the gang), gang-related greeting cards, gang-related birthday cards, gang-related memorial cards, lists of gang members/associates, gang-related drawings, and lists of rival gangs or gang members;

c.    Gang-related tangible items, such as gang-related clothing, gang-related memorial pins, and other items bearing gang symbols (such as weapons or jewelry).   Along these lines, NOB members/associates have been observed wearing gang-related clothing.

19.     I am aware that members and associates of violent street gangs, like NOB, will maintain weapons at their residence as such weapons are necessary (1) to carry out violent acts on behalf of the gang, and (2) to protect themselves from violent attack by rivals of the gang.   The type of weapons kept by gang members include firearms, knives, straight-edge barber razors, brass knuckles, baseball bats, and other forms of clubs/bludgeons. Along these lines, I am aware that local law enforcement officers have seized firearms from the residences of NOB members/associates on multiple occasions.

20.     I am aware that gang members and associates of violent street gangs, such as NOB, use their mobile phones to store gang-related materials, to communicate with other gang members, and to post gang-related materials on social media platforms.   The types of electronically stored materials include gang-related images (as discussed above), gang-related communications, and gang-related music or rap videos.   Along these lines, I am aware that several NOB members/associates, including Christmas, have posted gang-related images and communications on social media platforms.

## SEIZURE OF COMPUTER EQUIPMENT AND DATA

21.     From my training, experience, and information provided to me by other law enforcement officers, I am aware that individuals frequently use computers to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to online social-networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.

22.     Based on my training, experience, and information provided by other law enforcement officers and agents, I know that many smartphones (which are included in Attachment B's definition of "computer hardware") can now function essentially as small computers.   Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.   Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

23.     I am aware that NOB gang members and associates, including Christmas, utilize Facebook, Instagram, Whatsapp, Snapchat and text messaging to communicate with fellow gang members and associates, including as discussed above, as well as to communicate gang-related materials, including threats/challenges to other gangs.   NOB gang members/associates send messages and post photos of themselves in possession of firearms, controlled substances and proceeds and gathering together (in these group images, members/associates often flash gang hand signs and/or wear gang-related clothing).   NOB members/associates also use these postings to threaten or challenge other rival gangs, as well as to brag about/praise NOB and particular members/associates.

24.     Based on my knowledge, training, experience, and information provided to me by other law enforcement officers and agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet.   This is true because:

a.     Electronic files that have been downloaded to a storage medium can be stored for

years at little or no cost.   Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b.      Even after files have been deleted, they can be recovered months or years later using forensic tools.   This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.   In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media in particular, computers' internal hard drives contain electronic evidence of how the computer has been used, what it has been used for, and who has used it.   This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.   It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."   The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently-viewed Internet pages or if a user takes steps to delete them.

25.      Based on my knowledge and training and the experience of other law enforcement officers and agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either

from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized.   This is true because of:

a.      The volume of evidence storage media such as hard disks, flash drives, CDs, and DVDs can store is the equivalent of thousands or, in some instances, millions of pages of information.   Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names.   Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b.      Technical requirements in analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.   The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.   Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data.   Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files.   Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches.   Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."   Consequently, law enforcement

14

agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

26.     The premises may contain computer equipment whose use in the crimes or storage of the things described in this warrant is impractical to determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge.   In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant.   If the items described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize them onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

## IV

## <u>CONCLUSION</u>

27.     Based on the information described above, I have probable cause to believe that Christmas has committed the Target Offense.   Based on the information described above, I also have probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are contained within the Target Location as more fully described in Attachment A.

28.     In addition, we are requesting that the warrant be executed at any time in day or night, and without law enforcement officers announcing themselves, in order to minimize the risk/danger to the executing agents/officers, and other members of the community, given that the warrants seek to search a location used by gang members/associates who may be armed with firearms.

Signed electronically and sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on June 15, 2020.

/s/ *Brian Ball*
Detective Brian Ball
Boston Police Department

Electronically subscribed and telephonically sworn to before me this 15th day of June 2020

HONORABLE M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE

16

## **ATTACHMENT A**

## **DESCRIPTION OF PROPERTY TO BE SEARCHED**

The premise to be searched is 263 East Cottage Street, Apartment 2, Dorchester, Massachusetts.   It is located between Dorchester Avenue and Pleasant Street.   It is a three-family style residence, light blue in color.   The main door to the building is black in color, with the number "263" affixed to the door.   There are three door bells and three mail boxes to the right of the main door.   The Target Location is located on the second level of the building.   A photograph of the Target Location is attached hereto.

The search of the premises shall include all rooms, crawl spaces, safes, briefcases, storage areas, containers, and containers such as safes, vaults, file cabinets, drawers, luggage, briefcases, valises, boxes, jewelry boxes, cans, bags, purses, and trash cans located on or near the premises, that are owned or under the control of the occupants of such premises.



**ATTACHMENT B**

**ITEMS TO BE SEIZED**

I.       All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1962(d), including:

A.       Records and tangible objects pertaining to the following people, entities, physical addresses, telephone numbers, bank accounts, websites, e-mail addresses, IP addresses:

1.       Jahquel Christmas;

2.       NOB;

3.       Members and associates of NOB;

4.       Members and associates of the Wendover street gang;

B.       Records and tangible objects pertaining to the following topics:

1.       Firearms possession, including firearms, firearms accessories, body armor, ammunition, and documents relating to the purchase and possession of such items.

C.       Records and tangible objects pertaining to the payment, receipt, transfer, or storage of money or other things of value by Christmas, including, without limitation:

1.       Bank, credit union, investment, money transfer, and other financial accounts;

2.       Credit and debit card accounts;

3.       Tax statements and returns;

4.       Business or personal expenses;

5.      Income, whether from wages or investments;

6.      Loans;

7.      Cash;

8.      Jewelry, precious metals and other items of value.

D.      Records and tangible objects regarding NOB and its criminal activities,

including:

1.      Gang-related photos or images, such as group photos of gang

members, photos of other gang members/associates, photos of

gang-related graffiti, photos of gang-related hand signs, photos of

guns or drugs possessed by the gang, photos of stacks of money,

and photos of gang-related symbols;

2.      Gang-related documents, such as gang-related notes, gang-related

communications (including communications ordering gang

activities or discussing the operation of the gang), gang-related

greeting cards, gang-related birthday cards, gang-related

memorial cards, lists of gang members/associates, gang-related

drawings, and lists of rival gangs or gang members;

3.      Gang-related tangible items, such as gang-related clothing, gang-

related memorial pins, and other items bearing gang symbols (such

as weapons).

E.      Weapons, including firearms, brass knuckles, knives, razors, clubs and

baseball bats and documents relating to the purchase and/or possession of

such items;

F.   For any computer hardware, computer software, mobile phones, or storage media called for by this warrant or that might contain things otherwise called for by this warrant ("the computer equipment"):

1.   evidence of who used, owned, or controlled the computer equipment;

2.   evidence of the presence or absence of malicious software that would allow others to control the items, and evidence of the presence or absence of security software designed to detect malicious software;

3.   evidence of the attachment of other computer hardware or storage media;

4.   evidence of counter-forensic programs and associated data that are designed to eliminate data;

5.   evidence of when the computer equipment was used;

6.   passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;

7.   records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage; and

G.   Records and tangible objects relating to the ownership, occupancy, or use of the premises to be searched (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers).

II.   All computer hardware, computer software, and storage media.   Off-site

searching of these items shall be limited to searching for the items described in Paragraph I.

## DEFINITIONS

For the purpose of this warrant:

A.  "Computer equipment" means any computer hardware, computer software, mobile phone, storage media, and data.

B.  "Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, mobile phone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.  "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D.  "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

E.  "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F.  A "record" is any communication, representation, information or data.   A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

## RETURN OF SEIZED COMPUTER EQUIPMENT

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below.   If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes.